**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RUSH UNIVERSITY MEDICAL CENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 06 C 1550 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| MICHAEL O. LEAVITT, Secretary, Department | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Rush University Medical Center, f/k/a Rush-Presbyterian-St. Luke's

Medical Center ("Rush"), filed a three-count complaint against Michael O. Leavitt, the

Secretary of Health and Human Services (the "Secretary"), seeking review of the

Secretary's final decision reversing in part and affirming in part a decision of the

Provider Reimbursement Review Board ("PRRB") regarding reimbursement under

various Medicare programs.  Rush and the Secretary have filed cross-motions for

summary judgment.  For the reasons set forth below, Rush's motion is denied in part and

granted in part and the Secretary's motion is denied in part and granted in part.

**I. BACKGROUND**

This is a civil action arising under Title XVIII of the Social Security Act, 42

U.S.C. §§ 1395 *et seq.* (2006) (the "Medicare Act") and the Administrative Procedures

Act, 5 U.S.C. §§ 551-59 and 701-06 (2006) (the "APA").

Rush is a large, not-for-profit, certified Medicare-participating provider

("provider") in Chicago, Illinois.  Rush is also a teaching hospital where many residents

train in a number of specialties and sub-specialties. Pursuant to the Medicare statute and regulations, the federal government reimburses providers for the reasonable cost of medical services provided to eligible beneficiaries, including the costs of graduate medical education ("GME") and interest expenses on current and capital indebtedness.

The Centers for Medicare and Medicaid Services ("CMS") is the agency designated by the Secretary to administer the Medicare program. CMS engages contractors to act as fiscal intermediaries who, among other things, determine the amount of payments to be made to a provider by the federal government each year. Each provider is required to file a cost report with an intermediary at the close of every fiscal year. The intermediary audits the cost report and issues a Notice of Program Reimbursement which identifies and briefly explains any adjustments to the provider's cost report.

The PRRB is an independent panel authorized to hear appeals by providers dissatisfied with an intermediary's final determination. The Secretary, through authority delegated to the Administrator of the Health Care Financing Administration ("HCFA") may reverse, affirm, or modify the decision of the PRRB either on his own motion or upon request by the parties. The final decision of the Secretary is subject to judicial review pursuant to 42 U.S.C. § 1395$oo$(f)(1).

At issue is the Medicare cost report filed by Rush for fiscal year ending June 30, 1991 ("FY 1991").[1] The Intermediary[2] issued its audit findings and adjustments in a Notice of Program Reimbursement dated September 28, 1993. Rush appealed these adjustments to the PRRB by notice dated March 24, 1994. On June 12, 2002, a live

---

[1] Rush's cost reporting period begins on July 1 and ends on June 30.
[2] Health Care Services Corp. audited Rush's FY 1991 cost report in 1993 but the contractor has subsequently changed to AdminaStar.

evidentiary hearing was conducted before five members of the PRRB, and documentary evidence and witness testimony were presented. The PRRB considered the following issues:

(1) Whether the Intermediary's adjustment to and calculation of Rush's disproportionate share hospital payment was proper, specifically relating to the inclusion of general assistance days and the applicability of the Medicare Program Memorandum A-99-62 ("Issue 1");

(2) Whether the Intermediary's calculation of the number of interns and residents and the amount of allowable costs for FY 1991 for purposes of Rush's graduate medical education programs was proper ("Issue 2"); and

(3) Whether the Intermediary should have reclassified expenses relating to the Inn at University Village as investment losses and offset such losses against investment income rather than disallowing them entirely ("Issue 3").

Certified Administrative Record ("AR") 67.

After deliberating for over three years and requesting additional information, the PRRB issued its decision on November 18, 2005. The PRRB ruled in favor of Rush on the first and third issues. Regarding the second issue, the PRRB found that only one of Rush's thirteen fellowship programs constituted an "approved" program for purposes of GME reimbursement.

On January 20, 2006, the Secretary (through the Administrator) reversed in part and affirmed in part the decision of the PRRB. Rush now appeals the Secretary's final decision to this court.[3]

## II. STANDARD OF REVIEW

Under the APA, a court must affirm the Secretary's decision unless it is found to be arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with the law. 42 U.S.C. § 1395*oo*(f); *Thomas Jefferson*

---

[3] Rush seeks review only of those decisions by the Secretary that were adverse to it. Additional facts relevant to each issue are provided below.

*Univ. v. Shalala*, 512 U.S. 504, 512 (1994). An agency's interpretation of its own regulations must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. *See id.*; *Hinsdale Hosp. Corp. v. Shalala*, 50 F.3d 1395, 1399 (7th Cir. 1995). The court "must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.*, 512 U.S. at 512. The court acknowledges that "[t]his broad deference is all the more warranted when . . . the regulation concerns 'a complex and highly technical regulatory program,' [such as Medicare] in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Id.* (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991); *Adventist Living Centers, Inc. v. Bowen*, 881 F.2d 1417, 1421 (7th Cir. 1989) ("The Secretary's interpretation of regulations issued pursuant to the complex and reticulated Medicare Act is entitled to considerable deference.") However, the court also notes that "this does not shield the Secretary's decision from a thorough, probing, in-depth review." *Loyola University of Chicago v. Bowen*, 905 F.2d 1061, 1067 (7th Cir. 1990) (internal quotation marks omitted).

Moreover, the court does not reweigh the evidence or substitute its own judgment for that of the Secretary. *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). The court's inquiry is limited to whether there is substantial evidence to support the decision—it need not rule on the correctness of that decision. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Anderson v. Bowen*, 868 F.2d 921, 923

(7th Cir. 1989).

Rush challenges the Secretary's decision regarding Issues 1, 2, and 3 as being

arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and not

in accordance with the law. Rush often relies on the decision by the PRRB to support its

argument against the Secretary, noting that "[the Secretary's] action was the result of an

administrator's 60-day decision to arbitrarily reverse the findings of a 5-person board

which took more than 3 years to consider the evidence." Pl.'s Mem. 3.[4] However, the

court cannot give greater weight to the findings of the PRRB in its review of the

Secretary's decision because it took longer and may have worked harder. "Upon judicial

review of an agency decision, the Secretary is considered the fact-finder and deference is

given to the Secretary's factual findings." *Saint Mary of Nazareth Hosp. Center v.*

*Shalala*, 96 F. Supp. 2d 773, 776 (N.D. Ill. 2000) (quoting *Adventist Living Centers, Inc.*,

881 F.2d at 1420. "The fact that the PRRB and the Secretary may have reached different

conclusions in this case does not diminish the deference due to the Secretary's final

decision." *Adventist Living Centers, Inc.*, 881 F.2d at 1421.

### III. ANALYSIS

### A.  Disproportionate Share Hospital Calculation (Issue 1)

Rush contends that the Secretary erred in refusing to apply the plain language of

Program Memorandum A-99-62 ("PM A-99-62") to Rush's FY 1991 appeal of its

disproportionate share payment.

---

[4] Though the parties have filed cross-motions for summary judgment, the court will refer to Rush's motion as "Pl.'s Mem.," the Secretary's response and motion for summary judgment as "Def.'s Opp.," Rush's reply and opposition as "Pl.'s Reply," and the Secretary's reply as "Def.'s Reply."

*1. Summary of the Hold Harmless Rule*

Pursuant to 42 U.S.C. § 1395ww(d)(5)(F)(i)(I) (2006), hospitals that serve a "significantly disproportionate number of lower income patients" may receive additional Medicare payments. This is called the "disproportionate share hospital" ("DSH") adjustment. A hospital qualifies for the DSH adjustment for a given cost reporting period if its "disproportionate patient percentage" for that period equals or exceeds thresholds specified by statute. 42 U.S.C. § 1395ww(d)(5)(F)(v). The Secretary determines the DSH adjustment for a particular hospital based on the number of days that Medicaid patients spent in the hospital ("Medicaid days").

During the nineties, there was enormous confusion[5] about how Medicaid days were to be calculated. The short of it is that some fiscal intermediaries allowed hospitals to count any low-income-patient day, regardless of whether the patient was covered by state general assistance programs for low-income individuals—which are called "general assistance days"—or by the federally funded Medicaid program. The problem with this was that some states' provision of benefits under their own programs was counting towards those hospitals' reimbursement rate under Medicaid.

In December of 1999, the Secretary issued PM A-99-62, which clarified what days should and should not be included in the Medicaid fraction for cost reporting periods beginning on or after January 1, 2000. General assistance days were not to be included. However, noting the confusion over the issue of general assistance days, the

---

[5] Initially, the Secretary maintained that the numerator of the Medicaid fraction could only include those days for which the hospital received Medicaid payment (and not Medicare payment) for inpatient hospital services. However, after much confusion and litigation regarding the interpretation of the statute, the Secretary issued Ruling 97-2, in February of 1997, which provided that the Medicaid fraction should also include those days for which a patient was "eligible" for Medicaid benefits, even if the hospital received no Medicaid payment for its services. AR 13, 68. *See also St. Joseph's Hosp. v. Leavitt*, 425 F. Supp. 2d 94, 96 -97 (D. D.C., 2006) (describing the history of the DSH adjustment).

Secretary created what is known as the "Hold Harmless Rule" for DSH payments that had been calculated using general assistance program days for cost periods beginning prior to January 1, 2000.

The Hold Harmless Rule had two provisions intended to protect "providers that were genuinely confused or held a genuine belief" that the ineligible days were to be included in the DSH calculation. AR 15. First, hospitals that had received DSH payments based on the inclusion of general assistance days in cost reports settled before October 15, 1999, could keep the funds and continue to be reimbursed for the same types of program days for fiscal years beginning before January 1, 2000. *See St. Joseph's Hosp. v. Leavitt*, 425 F. Supp. 2d 94, 96-97 (D. D.C., 2006). Second, hospitals that did not receive payment calculated with general assistance days, but appealed claiming their entitlement to such payment prior to October 15, 1999, could receive DSH reimbursement reflecting the inclusion of otherwise "ineligible" general assistance program days[6] for fiscal years beginning prior to January 1, 2000. *See* AR 15 ("If, for cost reporting periods beginning before January 1, 2000, a hospital that did not receive payments reflecting the erroneous inclusion of otherwise ineligible days filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula before October 15, 1999, reopen the cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of Medicaid days.").

The Rule also contained the following direction to fiscal intermediaries:

---

[6] "Otherwise ineligible days" included "general assistance or other State-only health program, charity care, Medicaid DSH, and/or other ineligible waiver or demonstration population days for cost reports that were settled before October 15, 1999." *St. Joseph's Hosp.*, 425 F. Supp. 2d at 96-97.

Where, for cost reporting periods beginning before January 1, 2000, a hospital filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula *on or after* October 15, 1999, reopen the *settled* cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days, but only if the hospital appealed, before October 15, 1999, the denial of payment for the days in question in previous cost reporting periods. . . . Do not reopen a cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on *other* Medicare DSH issues or *other* unrelated issues. You are to continue paying the Medicare DSH adjustment reflecting the inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for all open cost reports for cost reporting periods beginning before January 1, 2000, to any hospital that, before October 15, 1999, filed a jurisdictionally proper appeal to the PRRB specifically for this issue on *previously* settled cost reports.

AR 195 (emphasis in original).[7]

Essentially, any hospital that did not raise the "precise issue" of the exclusion of general assistance days prior to October 15, 1999—the date the Hold Harmless Rule was first announced—could not be eligible for reimbursement based on those days. *See United Hosp. v. Thompson*, No. Civ. 02-3479(DWF/SRN), 2003 WL 21356086, at *4 (D. Minn. June 9, 2003), aff'd *United Hosp. v. Thompson*, 383 F.3d 728, 733 (8th Cir. 2004). The Secretary's position is that any hospital that raised the issue only after the Hold Harmless Rule was announced was presumed to be doing so to take advantage of the loophole, rather than out of genuine confusion over the rule. *See United Hosp.*, 383 F.3d at 733 ("The date of October 15, 1999 satisfies common sense (and the rational basis test) because any claims raised for the first time after that date would come from hospitals that knew full well that the Secretary's previous payments were undeserved.")

---

[7] The full text of PM A-99-62 can be found in the Administrative Record at pages 191-97.

However, as the court in *St. Joseph's Hospital* noted, a provider is not required to use any "magic words" in its notice of appeal to qualify for the Hold Harmless Rule, so long as the provider can point to evidence demonstrating that it was challenging the exclusion of general assistance days from the relevant cost report. *See St. Joseph's Hospital*, 425 F. Supp. 2d at 100.

## 2. Rush's Appeals

Rush raised the issue of general assistance days when it appealed its FY 1989 and FY 1990 cost reports, both of which were filed prior to October 15, 1999.[8] However, Rush did not include general assistance days in its DSH calculation in its FY 1991 cost report, and the Intermediary did not make an adjustment to eliminate general assistance days from Rush's DSH calculation. AR 3, 152; *see also* Rush's Resp. to Def.'s Statement of Facts ¶¶ 1-2. Therefore, when Rush appealed its FY 1991 cost report to the PRRB in March of 1994, it did not appeal the exclusion of general assistance days from its DSH calculation at that time, nor did Rush raise the issue in its "Identification of Additional Issues" filed in March of 1998. AR 2221, 1969. It was not until May of 2002 that Rush added the general assistance days issue to its pending FY 1991 appeal, through the submission of a revised final brief filed with the PRRB. AR 748.

Both the Secretary and the PRRB found that Rush did not raise the issue of general assistance days regarding its FY 1991 appeal until after October of 1999. *See* AR 16-17 (finding that Rush made no reference to appealing general assistance days in its notice of appeal to the PRRB and noting that the PRRB itself found that Rush did not add the issue of general assistance days until after October 1999). However, the PRRB found

---

[8] Rush identified the following issue: "To exclude General Assistance patient days from the calculation of Title XIX eligible days used in the Medicare disproportionate share payment amount." AR 884, 889.

that because Rush had raised the issue of general assistance days in its FY 1989 and FY 1990 appeals, it was entitled to Hold Harmless protection even though it added the issue to its FY 1991 appeal only after the Hold Harmless Rule was announced. The Secretary disagreed and reversed the PRRB's holding on the grounds that the PRRB's reading of the Hold Harmless rule was not supported by the provision's language.

a. Appeal Filed Prior to October 15, 1999

The court first addresses whether Rush filed a "jurisdictionally proper appeal" before October 15, 1999 regarding the exclusion of general assistance days from its FY 1991 cost report. *See* PM A-99-62 (directing intermediaries to revise cost reports to include general assistance days if the hospital "filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days . . . before October 15, 1999"). Although Rush had filed a jurisdictionally proper appeal of its FY 1991 cost report prior to October 15, 1999, Rush did not explicitly challenge the exclusion of general assistance days in its notice of appeal. AR 2221; 73.

However, on April 1, 1998, Rush filed a position paper with the PRRB that raised the following issue: "The Intermediary's calculation [of Rush's disproportionate share payment] did not include all inpatient hospital days as directed by HCFA Ruling No. 97-2 dated February 27, 1997." AR 1743. Rush argues that the language it used in this position paper is broad enough to include the general assistance days.[9] Pl.'s Mem. 10. This proposition was rejected by the court in *United Hospital*, which held that "on its face, [PM A-99-62] requires that, in order to be eligible for relief, a hospital must have

_____

[9] Neither the Secretary nor the PRRB found this to be a statement by Rush that it was appealing the exclusion of general assistance days.

raised the precise issue of exclusion of general assistance days before October 15, 1999."

2003 WL 21356086, at *4.

Rush argues that the language could include the issue of general assistance days,
citing *St. Joseph's Hospital* for the proposition that it is not required "to include the
magic words 'general assistance days'" in its notice of appeal to qualify for the Hold
Harmless Rule. *See St. Joseph's Hospital*, 425 F. Supp. 2d at 100. In *St. Joseph's
Hospital*, the provider's appeal stated, "We believe the DSH reimbursement is
significantly understated. The intermediary did not properly recognize all appropriate
DSH related days of service." *Id.* at 99. However, examination of the underlying audit
report and the intermediary's audit workpapers, which contained "the more detailed
analysis of the intermediary's basis for the adjustment," revealed that this *specifically*
referred to the exclusion of general assistance days. *See id.* at 100 (noting that the
workpapers stated that DSH will be disallowed because of the inclusion of "general
assistance patients" and "claims paid by General Assistance"). Based on these
underlying documents, the court held that the provider had appealed the precise issue of
general assistance days, even if it did not use the "magic words" in its notice of appeal.
*Id.*

That is not the case here, where Rush has pointed to no evidence or documentary
supplements that would indicate that the broad language used in its FY 1991 appeal
referred to the exclusion of general assistance days. Nor can it, in light of the undisputed
fact that the Intermediary did not eliminate general assistance days from Rush's DSH
calculation in its FY 1991 cost report. AR 3, 152. Rush must do more than argue that the
language it used *could have* included the issue of general assistance days; it must

demonstrate that general assistance days were excluded from its DSH calculation and that Rush appealed that exclusion. Furthermore the record demonstrates Rush knew perfectly well how to appeal the precise issue of general assistance days prior to the time it appealed its FY 1991 cost report. *See* AR 884, 889 (when appealing its FY 1989 and 1990 cost reports, Rush identified the following issue: "To exclude General Assistance patient days from the calculation of Title XIX eligible days used in the Medicare disproportionate share payment amount."). Therefore, the Secretary's finding that Rush did not appeal the exclusion of general assistance days from its FY 1991 cost report prior to October 15, 1999, *see* AR 16-17, is neither arbitrary nor capricious.

b. The Effect of Prior Appeals of General Assistance Days

The court next addresses whether Rush's history of appealing the exclusion of general assistance days in prior cost reports[10] entitles Rush to apply the Hold Harmless Rule to its DSH payment calculation for FY 1991.

It was not until May of 2002 that Rush added the general assistance days issue to its pending FY 1991 appeal, through the submission of a revised final brief filed with the PRRB. AR 74. However, the PRRB found that "adding the general assistance days issue to the pending appeal in this instance [was] equivalent to filing a jurisdictionally proper appeal" because of Rush's prior history of appealing the exclusion of general assistance days.[11] AR 73-74. The Secretary disagreed, noting that this would render meaningless the provision of the Rule specifically directing intermediaries *not* to "reopen a cost report

---

[10] Rush's FY 1989 and 1990 cost reports are not at issue here.

[11] Presumably the PRRB relied on the provision of PM A-99-62 that states, "Where, for cost reporting periods beginning before January 1, 2000, a hospital filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula *on or after* October 15, 1999, reopen the *settled* cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days, but only if the hospital appealed, before October 15, 1999, the denial of payment for the days in question in previous cost reporting periods." AR 195. There is no dispute that Rush appealed the denial of general assistance days in FY 1989 and 1990.

and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on *other* Medicare DSH issues or *other* unrelated issues." AR 17 (emphasis in original). In other words, the Secretary held that the Hold Harmless Rule did not apply to any provider that *added* the issue of general assistance days to a pending appeal after October 15, 1999, notwithstanding a prior history of appealing the issue.

Rush argues (relying on the PRRB decision) that this creates an arbitrary distinction between two similarly situated providers. That is, a provider that filed an appeal for the first time after October 15, 1999, would have hold harmless protection if it had a history of challenging the exclusion of general assistance days, whereas a provider that had an appeal pending but added the issue of general assistance days would not be entitled to hold harmless protection even though it had the same history of claiming the exclusion. This distinction, however, is rationally related to the Secretary's goal of separating those "providers that were genuinely confused or held a genuine belief" that the ineligible days were to be included in the DSH calculation, *see* AR 15, from those who sought to take advantage of the Rule by raising the issue only after the Rule was announced. *See United Hosp.*, 383 F.3d at 730 ("The basic structure of the Program Memo distinguished between hospitals that wrongly believed themselves eligible for reimbursement for state-only days, and hospitals that correctly realized they were not eligible but then pursued benefits once it became clear that the mistaken hospitals would not have to pay for their error.")

The Secretary's position is that the provision relied upon by Rush applies only to hospitals that had not had the opportunity to appeal any issue—either because the hospital had not yet received the intermediary's Notice of Program Reimbursement, or because the time period to appeal the Notice of Program Reimbursement had not expired. Def.'s Opp. 17. Rush had the opportunity to appeal the issue of general assistance days when it initially filed its appeal in 1994, but chose not to—a decision that might indicate, given its prior history of appealing the issue, that Rush was no longer "genuinely confused" about the eligibility of such days.[12] Its addition of the issue only after the Hold Harmless Rule was announced does not entitle it to the Rule's protection despite its prior history of appeals.

Rush also argues that its prior appeals qualify it for hold harmless protection because of the provision which states that an intermediary should "continue paying the Medicare DSH adjustment reflecting the inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for all open cost reports for cost reporting periods beginning before January 1, 2000, to any hospital that, before October 15, 1999, filed a jurisdictionally proper appeal to the PRRB specifically for this issue on *previously* settled cost reports." *See* AR 195 (emphasis in original).

The Secretary held that because Rush's prior appeals had not been successful, the intermediary could not "*continue* to pay the Medicare DSH adjustment reflecting the inclusion of [general assistance] days," reasoning that because Rush had never received payment in the past reflecting the inclusion of general assistance days, it would not have

_____

[12] This is further substantiated by the undisputed fact that Rush did not attempt to include general assistance days in its FY 1991 cost report.

made a budgeting decision based on the erroneous belief that it would be entitled to continued payments. AR 17 (emphasis in original). This is consistent with the rationale of the Hold Harmless Rule, which was intended to protect providers who were operating under the erroneous belief that they were entitled to include general assistance days for purposes of Medicare reimbursement, and who had budgeted in reliance on intermediaries who allowed them to include those days in their cost reports. Rush's proposed interpretation would render meaningless the words "continue to pay." "Courts are to avoid interpretations of agency regulations which render words superfluous." *Gillespie v. Trans Union, LLC*, 433 F. Supp. 2d 908, 914 (N.D. Ill. 2006)

The Secretary's interpretation of PM A-99-62 to exclude Rush is neither "plainly erroneous [n]or inconsistent with the regulation." *See Thomas Jefferson Univ.*, 512 U.S. at 512. The Secretary has consistently maintained that the Hold Harmless policy was intended only to protect those providers that held "an independent and genuine belief that they were entitled to general assistance days." *See United Hosp.*, 2003 WL 21356086, at *6 ("[T]o the extent that the Secretary sought to provide relief to hospitals that had an independent and genuine belief that they were entitled to general assistance days while simultaneously exercising fiscal responsibility, the October 15, 1999, deadline separates hospitals that genuinely believed they were entitled to general assistance days from hospitals that did not believe they were entitled to such days until the issuance of the Program Memo.") Rush has not demonstrated that it is such a provider. Accordingly, the court grants the Secretary's motion for summary judgment and denies Rush's motion for summary judgment on this issue.

### B. Graduate Medical Education Reimbursement (Issue 2)

*1. Rush's Fellowship Programs*

Rush argues that the Secretary erred in finding that certain of its fellowship programs did not meet the statutory and regulatory definitions of an "approved medical residency program." Pursuant to the Social Security Act of 1965, hospitals are reimbursed by the Medicare program for costs relating to medical education.[13] This includes both Direct Graduate Medical Education ("DME") costs and Indirect Graduate Medical Education ("IME") costs. The hospital's reimbursement is based on the number of its full-time equivalent residents ("FTE") participating in approved medical residency programs.

An "approved medical residency program" is one that meets one of the following criteria:

(1) Is approved by one of the national organizations listed in § 405.22(a) of this chapter.
(2) May count towards certification of the participant in a specialty or subspecialty listed in the Directory of Residency Training Programs published by the American Medical Association.
(3) Is approved by the Accreditation Council for Graduate Medical Education (ACGME) as a fellowship program in geriatric medicine . . . .

42 C.F.R. § 413.86(b) (1990).[14]

In FY 1991, Rush claimed reimbursement for the costs associated with twenty-eight residents participating in thirteen fellowship programs. The PBBR concluded that twelve of the thirteen programs were not "approved programs." The PBBR exempted

---

[13] The payment policy for these costs is found in Section 1886(h) of the Act, which provides, *inter alia*, "The Secretary shall determine, for each hospital with an approved medical residency training program, an approved [full-time-equivalent] resident amount for each cost reporting period beginning on or after July 1, 1985," and directs the Secretary to "establish rules consistent with this paragraph for the computation of the number of full-time-equivalent residents in an approved medical residency training program." 42 U.S.C. § 1395ww(h)(2) (2006); 42 U.S.C. § 1395ww(h)(4)(A) (2006).

[14] Rush argues that this regulation was not promulgated until September of 1989, nine months prior to the beginning of Rush's FY 1991. As a result, Rush "had little or no opportunity to make adjustments in conformity with the regulation." Pl.'s Mem. 24. Even if this were true, Rush has pointed to no authority that would allow the court to waive the application of the regulation to Rush for its FY 1991 cost report.

Rush's neuroradiology program because, though the program was not approved by the ACGME until October 22, 1991, after the cost reporting period had ended, "the ACGME approval would be based upon the program's conduct in the subject cost reporting period." AR 75. The Secretary held that none of Rush's programs—including the neuroradiology program—was an approved program. The Secretary's position is that the program must be approved by the appropriate authority during the cost reporting period in order to qualify as an "approved program" for purposes of this reimbursement. Def.'s Opp. 26. Rush now appeals the finding and argues that its neuroradiology, spine and forensic psychiatry fellowship programs should be counted as approved programs.

Rush concedes that none of these programs received its ACGME approval until after the cost reporting period for FY 1991 had ended. Pl.'s Mem. 25. Rush's spine fellowship program was approved by the ACGME in 1993, its forensic psychiatry fellowship program was approved in 1998, and its neuroradiology program was accredited on October 22, 1991. *Id.* Though Rush contends that these programs were approved by other organizations, it does not argue or demonstrate that those organizations are "approved by one of the national organizations listed in § 405.22(a)." *See* 42 C.F.R. § 413.86(b) (1990).

Rush also states—without pointing to anything in the record—that the programs constituted a postgraduate medical training program that may be counted towards certification in its respective sub-specialty. Pl.'s Opp. 25. However, the regulation requires that the program count towards certification in a specialty or sub-specialty listed in the AMA's Directory of Residency Training Programs. Rush has not pointed to anything that demonstrates that these programs met this requirement. The Secretary's

decision must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. *Thomas Jefferson Univ.*, 512 U.S. at 512. Given the plain language of the regulation, the Secretary's decision to disallow the three fellowship programs at issue was not unsupported by the law or substantial evidence.

Nor was the Secretary's disallowance of Rush's neuroradiology program improper given the undisputed fact that the program was not accredited until after the cost reporting period had ended. Rush has pointed to no rule or regulation that would justify retroactively applying an accreditation to a program for reimbursement purposes. The Secretary's position that the fellowship program must be approved by a recognized approving organization "at the time of the subject cost reporting period" is reasonable. AR 21. *See Little Co. of Mary Hosp. and Health Care Centers v. Shalala*, 994 F. Supp. 950, 956 (N.D. Ill. 1998) ("the dispositive question is whether Secretary's reading is a reasonable construction of the controlling regulatory language").

Rush next argues that it can still be reimbursed for the disallowed fellowship participants pursuant to 42 C.F.R. § 405.523 (1990), which provides, *inter alia*, that "[t]he services of a hospital resident or intern who is not under an approved teaching program in the hospital are reimbursable to the hospital on a cost basis under the supplementary medical insurance program." 42 C.F.R. § 405.523 (1990). The Intermediary did not dispute that Rush would be entitled to reimbursement under this provision, but the PRRB noted that Rush had not provided the necessary documentation (Worksheet D-2) because Rush "believed each resident would be included in its FTE counts." AR 75. Therefore, the PBBR ordered Rush to "revise its cost report and furnish all documentation required by the Intermediary to support its claim." AR 75.

The Secretary reversed, holding that remand was not appropriate to determine whether Rush was entitled to compensation under 42 C.F.R. § 405.523 because "the Intermediary stated that it understood [Rush] did not have the voluminous data necessary to complete Worksheet D-2, nor has [Rush] offered the proof that such documentation exists." AR 22-23. The Secretary's determination that Rush does not have the data necessary to complete Worksheet D-2 is contradicted by the testimony of Karen Williams, the Director of Cost Accounting at Rush. Williams testified that Rush could provide "payroll records, salaries, and fringes," and other data that would be provided from the Provider Statistical and Reimbursement report. AR 135.

The Secretary argues that despite Williams' testimony, Rush "never actually produced the required data to the Intermediary or before the PRRB." Def.'s Opp. 30. However, this does not prove that Rush does not have the data. The Secretary's opinion is unhelpful, simply providing, "the Intermediary stated that it understood that [Rush] did not have the voluminous data necessary to complete Worksheet D-2, nor has [Rush] offered proof that such documentation still exists." AR 22-23.

The Secretary's ruling on this issue, when combined with the above ruling, effectively foreclosed all possibility of reimbursement to Rush for its fellowship programs. The court sees no reason in the Secretary's decision that justifies preventing Rush from at least attempting to meet its burden of completing Worksheet D-2 in order to be reimbursed for its fellowship programs in some way. Accordingly, the court remands this issue so that Rush can be allowed to complete Worksheet D-2.

*2. Rush's Residency Programs (Drs. Muhsin, Wong and Miles)*

Rush's next argument is that the Secretary improperly disallowed 3.0 FTEs (representing Dr. Muhsin, Dr. Wong and Dr. Miles) from Rush's IME count.

In order to be included in Rush's FTE count for purposes of IME, the hospital must submit an annual report to the Intermediary listing all the residents and interns assigned to the hospital and providing services to the hospital on the "count date," which is September 1 unless that date falls on a weekend or federal holiday.[15]  *See* 42 C.F.R. § 412.118(f) (1990).  However, the regulation provides that:

> Interns and residents who are assigned to a setting other than the inpatient or outpatient department of the hospital (such as a freestanding family practice center or an excluded distinct part hospital unit) on the day that the count of interns and residents . . . is made are not counted as full-time equivalents.  Only the percentage of time that these residents spend in the portion of the hospital subject to the prospective payment system or in the outpatient department of the hospital on the day the count is made is used to determine the indirect medical education adjustment.

42 C.F.R. § 412.118(f)(5) (1990).  The Secretary disallowed the three FTEs for the above mentioned residents because, although they were participating in approved teaching programs, there was not sufficient documentation to demonstrate that they were present in the appropriate location within Rush's facility.

### a.   Dr. Muhsin

Rush's rotation schedule places Dr. Muhsin at the Johnston R. Bowman Center ("JRB Clinic") on the IME count date.  The JRB Clinic is a psychiatry and rehabilitation clinic that Rush asserts was also an acute care facility during the relevant time period.  Though a resident assigned to an acute care facility would qualify Rush for the 1.0 FTE it is claiming, a resident assigned to the psychiatry and/or rehabilitation clinic—or the "subprovider units"—would not.  *See* 42 C.F.R. 412.105(f)(1)(ii) (1990).

---

[15] For FY 1991, because September 1 fell on a holiday weekend, the applicable "count date" was September 4, 1990.

The Secretary examined Dr. Muhsin's rotation schedule, which does not specify the area of the JRB clinic to which Dr. Muhsin was assigned on September 4, and noted that "The record shows that the Provider could not provide documentation specific enough that the resident did not rotate through the Provider's subprovider unit on the IME count date." AR 22. Based on this, the Secretary disallowed the 1.0 FTE associated with Dr. Muhsin for IME.

Rush contends that the rotation schedule of Dr. Muhsin demonstrates he was at Rush on the IME count day, and therefore Rush is entitled to the 1.0 FTE related to his residency. However, the Secretary disallowed the FTE on the ground that Dr. Muhsin may have been in an excluded area; that is, an area of the hospital not covered by 42 C.F.R. § 412.118(f) (1990). Rush argues that the Secretary's decision was "arbitrary and capricious" because there is no evidentiary support for the proposition that Dr. Muhsin's rotation may have been to an excluded distinct part of Rush's hospital; and points to testimony from the hearing where a Rush representative testified as follows:

> Q: And then finally, with respect to Dr. Mushin on page 14, there is a statement here that Dr. Muhsin's rotation appears to have lasted from 7-24-90 to 9-14-90, and it was located in the JRB?
> A: Yes, that is what it states here.
> Q: What is the JRB?
> A: The JRB is a Johnston R. Bowman Center for, typically, psych and rehab, but at that year, it also was an acute care facility.
> Q: Okay. So that is a Rush facility?
> A: It is a Rush facility.
> Q: And it has acute care components?
> A: It did at that time have acute care components.
> Q: But it also has distinct part unit components?
> A: Yes, it does.
> Q: Okay. And do you believe the Intermediary's contention here to be that it is not clear whether they were in an allowable non-allowable [sic] portion of the JRB?
> A: That is how I read her . . .

AR 138.  This testimony, however, does not prove that Dr. Muhsin was rotating through a proper unit of the hospital; it proves that Dr. Muhsin was rotating through the JRB, a facility that contained both allowable and non-allowable portions for purposes of 42 C.F.R. § 412.118(f) (1990).  Rush contends that the Secretary's decision is based on speculation that Dr. Muhsin was in the non-allowable portion of the JRB but Rush does not point to evidence that proves he was rotating through the acute care facility.  "It is the provider, not the intermediary, that bears the burden of providing evidence to establish its claim." *Saint Mary of Nazareth Hosp. Center*, 96 F. Supp. 2d at 779 (citing *Johnson County Mem. Hosp. v. Heckler*, 761 F.2d 354, 358 n. 8 (7th Cir. 1985)).  Rush offers nothing to demonstrate that the Secretary's decision was not based on substantial evidence.  Its only argument is that it is entitled to the benefit of the doubt when presenting ambiguous evidence in support of its claims.  The court does not agree.  Therefore, the court finds that the Secretary's decision regarding Dr. Muhsin was neither arbitrary nor capricious and is due deference by this court.

### b. Dr. Miles and Dr. Wong

Rush's argument regarding Dr. Miles and Dr. Wong also fails.  Dr. Miles and Dr. Wong both participated in Rush's maternal/fetal fellowship program but Rush did not submit their rotation schedules to establish the doctors' location in the hospital on September 4, 1990.  The Secretary disallowed the FTEs for both doctors, noting that Rush "did not furnish reasonable documentation to the Intermediary identifying the location of the residents' training in the hospital on the date of the IME count."  AR 22. Rush does not deny that it failed to submit the rotation schedules of these doctors but contends that due to the nature of the maternal/fetal fellowships—which focus on high-

risk mother and baby care—the doctors could not have been rotating through the non-allowable portions of the hospital, which are the psychiatry and rehabilitation units, and various outpatient clinics. *See* Pl.'s Mem. 33.

It was within the proper discretion of the Secretary to require documentation of the doctors' whereabouts rather than relying on the inference that because a maternal/fetal fellow would not work in one of the excluded areas of the hospital, the doctors had to have been working in one of the included areas of the hospital. The Secretary uniformly relied on rotation schedules to establish the locations of the individual residents for purposes of the IME count. *See* AR 22. Given that Rush did not submit rotation schedules for either Dr. Miles or Dr. Wong, and in light of Rush's burden to prove its claims, the court finds that the Secretary's decision was neither arbitrary nor capricious. Accordingly, the court grants the Secretary's motion for summary judgment and denies Rush's motion for summary judgment on this issue.

### C. The Inn at University Village (Issue 3)

Rush's next challenge pertains to whether the Secretary properly disallowed Rush's operating losses resulting from The Inn at University Village (the "Inn"), which is a hotel owned and operated by Rush.

Pursuant to 42 U.S.C. § 1395x(v)(1)(A) (2006), Medicare will reimburse health care providers for reasonable and necessary costs related to the efficient delivery of health services. *See also* 42 C.F.R. § 413.9. This includes capital-related costs such as interest on current and capital indebtedness, which means a provider can be reimbursed for interest paid on loans taken for purposes reasonably related to patient care. *See*

Provider Reimbursement Manual ("PRM") § 202.2; § 200.[16]  However, if a provider

borrows money to invest in a *nonpatient care activity*, the interest incurred by the

provider is not allowable.  *See* PRM § 202.2 ("Where funds are borrowed for purposes of

investing in other than the provider's own patient care related activities, interest expense

is not allowable.  Such a loan is not considered necessary.").

The Medicare system discourages unnecessary borrowing by hospitals.  Loans

"that result in excess funds or investments" are not considered "necessary."  *See* PRM §

202.2.  Therefore, the interest on those loans is not an allowable cost.  Before resorting to

loans, hospitals are required to withdraw available funds from their funded depreciation

account for the acquisition of depreciable assets or other capital purposes.   PRM §

226.4(c).  This reduces the interest expense that Medicare is required to reimburse; if the

hospital has the funds readily available, additional loans are not "necessary."

To avoid reimbursing interest on loans which result in excess funds or

investments, a provider's allowable interest expense is offset by the "net investment

income," which is the aggregate amount realized from all investments of patient care

funds in nonpatient care related activities, including interest, operating profits and losses,

and investment gains and losses.  *See* PRM § 202.2(C).  This prevents hospitals from

unnecessarily borrowing money at Medicare's expense to invest in nonpatient care

activities when those hospitals could be using their existing funds.  *See Cheshire Hosp. v.*

*New Hampshire-Vermont Hospitalization Serv., Inc.*, 689 F.2d 1112, 1119 (1st Cir. 1982)

---

[16] The PRM provides interpretive rules promulgated to implement Medicare regulations for determining
the reasonable cost of provider services.  "Black-letter law directs that such interpretive rules are entitled to
deference as long as they do not alter the substantive obligations created by the Medicare statute and its
regulations."  *Little Co. of Mary Hosp. and Health Care Centers v. Shalala*, 994 F. Supp. 950, 956 (N.D.
Ill. 1998)

(the "offset rule's sole purpose is to deter excess borrowing and thereby prevent providers from obtaining financial advantage from trading on the Medicare system").

If a hospital loses money from an investment made with patient care funds, theoretically that loss could increase a hospital's reimbursement; the loss would reduce the hospital's net investment income, increasing its allowable interest expense subject to Medicare reimbursement. However, a hospital must have used patient care funds, rather than borrowed funds, to fund the losing investment. *See* PRM § 202.2(C) ("if the funds invested in nonpatient care activities are borrowed, the interest expense is not allowable and the investment income is not subject to offset").

Here, the key issue is whether the Secretary's finding—that Rush used proceeds from an Illinois Educational Facilities Authority ("IEFA") loan to finance the construction of the Inn, which is a nonpatient care investment—was arbitrary, capricious, an abuse of discretion, or not in accordance with the law.

*1. Factual Background*

The Inn is a 114-room full-service hotel that provides accommodations, meeting rooms and a restaurant. Pl.'s Statement of Facts 58. It is 100% owned by Rush. *Id.* Construction for the Inn began in the Spring of 1987 and was completed in the Fall of 1988. AR 94. The Inn cost $9.8 million to build. AR 347. Rush paid for the Inn's construction out of its general operating fund. AR 110, 112.

In July of 1987, Rush took a $10 million IEFA loan. The loan was taken to reimburse the hospital for various expenditures that had already been made between six and twenty-three months prior to the loan. The loan proceeds were deposited into the hospital's general operating account.

In FY 1991, the Inn suffered a net operating loss. Rush originally sought to have the Inn classified as a patient care related activity, thereby allowing it to claim related interest and amortization expenses as a "necessary" capital cost. It is undisputed that the Intermediary disallowed $751,151 for interest and amortization expenses related to the Inn from the $10 million IEFA bond issue for the reason that the Inn was not related to patient care. Pl.'s Resp. Def.'s Statement of Facts ¶ 34.

Rush then altered its course, claiming that the Inn is a nonpatient care investment funded by patient care funds and it could use the Inn's operating loss and expenses to reduce Rush's net investment income, thereby increasing its allowable interest expense subject to Medicare reimbursement.[17] Rush also sought to have the interest expense relating to the $10 million IEFA loan allowed as a reimbursable interest expense.

The Secretary found that Rush used the proceeds of the IEFA loan to construct the Inn. AR 25. Because interest is not allowable on borrowed funds invested in nonpatient care activities, the interest from the IEFA loan was disallowed. *Id.* For the same reason, the Secretary did not allow Rush to use the loss from the Inn to offset its investment income. *Id.*

*2. Analysis*

Rush argues that the Secretary's finding was arbitrary, capricious, an abuse of discretion, and not in accordance with the law because the evidence does not support a finding that the funds invested in the Inn came from the IEFA loan rather than proceeds from patient care related activities. The court reiterates that in reviewing an agency

---

[17] Rush concedes that the costs incurred by the Inn were not related to patient care. Pl.'s Mem. 37. However, in Rush's first notice of appeal, it attempted to categorize the Inn as patient care related. One of the issues it identified was: "To offset interest and amortization relating to the Inn (from $10 M IEFA loan) as non-patient care related." AR 2221.

decision, the court does not reweigh the evidence or substitute its own judgment for that of the Secretary. *Cass*, 8 F.3d at 555. The court's sole inquiry is whether there is substantial evidence to support the Secretary's decision. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Loyola University of Chicago*, 905 F.2d at 1067 (quoting *Richardson v. Perales,* 402 U.S. 389, 401(1971)).

The Secretary found that Rush used the borrowed funds from the IEFA loan to finance the construction of the Inn. The Secretary relied on the following evidence to support this finding. First, Rush took the IEFA loan "in and around that time [sic] of the construction of the Inn." AR 25. The IEFA Loan Agreement was dated July 1, 1987, and construction on the Inn began in the spring of 1987 and was completed in the fall of 1988. AR 94. Second, the Secretary found that the interest on the IEFA loan was booked in Rush's books as associated with the Inn. *Id.* (citing Rush's Exhibit 45). Third, the Secretary interpreted a notation by Rush's accountant, Arthur Anderson, in the Intermediary's FY 1989 workpapers to mean that the IEFA loan proceeds were used to build the Inn.[18] *Id.*

---

[18] The notation states, "AA&CO noted that the interest expense relating to the $10MM debt used for construction of the Inn at University Village was not being properly capitalized. . . . The 10MM debt is considered to be a tax-exempt borrowing. However, the hotel built with these proceeds is not considered a qualifying asset. . . ." AR 25. Ms. Pardieck, the Intermediary's accountant, testified that this statement meant Arthur Anderson had concluded that the $10 million proceeds from the IEFA bond were used to build the Inn. Rush contends that the Arthur Anderson comment could have a different interpretation. However, it is not the job of the court to question the judgment of the Secretary in choosing between two conflicting interpretations of a document. The Secretary's judgment to believe the interpretation of Ms. Pardieck over Rush's witness is entitled deference.

The Secretary also found that the IEFA loan was "unnecessary borrowing" because Rush had sufficient funds available in its funded depreciation account around the time it took the IEFA loan.[19]

The Secretary's position is that Rush "effectively" used the loan proceeds to finance construction of the Inn. Def.'s Opp. 41. Though the Secretary's finding is not supported by direct evidence, taken together, the timing of the loan coinciding with the construction; the amount of the loan compared with the cost of construction; and the fact that Rush was booking interest on its books as associated with the Inn, all support a finding that Rush used the borrowed funds to finance the construction of the Inn.

Rush makes two arguments in support of its position. First, it argues that because the construction of the Inn was financed with money from the General Operating Fund, the IEFA loan proceeds were not "actually" used to construct the Inn. Essentially, Rush is arguing that the IEFA loan proceeds lost their character as "loan proceeds" once they were deposited into the hospital's General Operating Fund. Even if this were to be a compelling argument, the Secretary's finding—based on Rush's own documents—that Rush was booking all interest and amortization on the IEFA loan to the Inn's cost center demonstrated that there was a link between the IEFA loan and the Inn, even if the IEFA check was not specifically earmarked for the Inn.

Second, Rush protests that it could not have used the IEFA loan proceeds on the Inn because it was bound by covenants within the loan, which required the proceeds to be used "to finance, refinance, and/or be reimbursed for all or a portion of the costs of completing the projects described in Exhibit B" (which does not include the Inn). AR 1272. Although the Secretary acknowledged that the purpose of the loan, based on the

---

[19] Rush does not dispute this finding, arguing instead that it is irrelevant.

loan documents, was to reimburse Rush for previously made capital expenditures, it noted that there was no method by which Rush was obligated to account for the funds' actual use. AR 25. The fact that Rush had sufficient funds available at the time it took the IEFA loan, rendering the loan "unnecessary," made the loan look suspicious. Furthermore, the Secretary argues, the stated purpose of the loan was to reimburse Rush for equipment that had been purchased "long before the funds were obtained," which, when combined with the timing of the loan, demonstrates that Rush's intent in obtaining the loan was really to develop the hotel. Therefore, the Secretary looked beyond the stated use of the loan. When Rush received the IEFA loan proceeds, they were deposited in Rush's general operating account, from which the funds for the Inn came. AR 110. The stated purpose of the loan is not conclusive in light of the other evidence the Secretary considered. Though this is not a clear cut case,[20] the evidence that the Secretary relied on is adequate to support the conclusion reached.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in part and plaintiff's motion for summary judgment is denied in part.[21] The court remands the issue of whether Rush is entitled to reimbursement under 42 C.F.R. § 405.523 (1990) so that Rush can complete Worksheet D-2. If Rush is entitled to additional reimbursement for its "unapproved" fellowship programs, the Secretary does

---

[20] Indeed, Rush admits as much, conceding that "there may have been some level of confusion about a link between the IEFA loan and the Inn." Pl.'s Reply 24.

[21] Rush has filed a motion to strike the Secretary's response because he did not comply with Local Rule 56.1. However, the court has relied almost exclusively on the Certified Administrative Record for the relevant "material facts." Given that there are no material facts in dispute, and in light of the fact that the Secretary filed a corrected response, the Secretary's failure to comply with the local rule is excusable. *See Saint Mary of Nazareth Hosp. Center v. Shalala*, 96 F. Supp. 2d 773, 780, n.6 (N.D. Ill. 2000) (Secretary's failure to comply with Rule 56.1 excusable given that the material facts required for decision were contained in the administrative record.)

not dispute that Rush will also be entitled to interest on the reimbursement, pursuant to 42

U.S.C. § 1395oo(F)(2).


                                        ENTER:

                                          _____/s/_____
                                          JOAN B. GOTTSCHALL
                                          United States District Judge

DATED:  September 4, 2007